The next case is number 09-3043, Anthony Torres against the Department of Justice. Mr. Martin. Thank you, Your Honor. May I please the Court? My name is Aaron Martin, here on behalf of first, whether the arbitrator applied the correct legal standard. Second, whether there was sufficient evidence to support the arbitrator's finding, and three, whether the arbitrator's reward was unreasonable. First, the petitioner contends that the arbitrator failed to apply the correct legal standard. It is well established that an agency may remove an employee only for such causes will promote the efficiency of service. To satisfy that requirement, the agency must show, by preponderance of the evidence that there is, between the employee's misconduct and his or her efficiency of service. It is evident that the arbitrator made no express finding on the nexus requirement. The dispute is whether the arbitrator's award actually implied a finding on the nexus requirement. We have said that a finding can be implied, haven't we? Yes, Your Honor. We would disagree that there was such an implication in the arbitrator's award. Do you agree that there, or is it your position that there's, are you arguing that there wasn't substantial evidence for a nexus? That's another argument, Your Honor. First, we'd argue that there was no such implication to begin with. Second of all, if there was such an implication, there was not sufficient evidence to support such an implication. Give us your strongest argument. As you know, time is very tight. Yes, Your Honor. We believe our strongest argument is that the arbitrator's decision to uphold the termination was unreasonable. As stated in the petitioner's reply, the express purpose for the judicial review of an arbitrator's decision is to bring those decisions into conformity with the MSPB. The arbitrator's decision to uphold the termination was not in conformity with the decisions of the MSPB. And when you say it was unreasonable, are you attacking the penalty determination by the arbitrator? Mainly, Your Honor. Yes. We're arguing that other similar decisions by the MSPB where similar facts have been presented have not resulted in a termination. MSPB is reviewed through… You're saying removal. In other words, what about this case, in your view, makes the penalty of removal unreasonable? Yes, Your Honor. We would argue that, first of all, the actions were not as serious as other MSPB decisions that have resulted in termination. The petitioner admitted to steroid use. And in other instances where the employee used drugs more serious, such as a Schedule I or Schedule II drug, opiates, marijuana… Steroids are Schedule III, is that correct? I'm sorry? The steroids are Schedule III? Yes, sir. Controlled substance. Let me help you here to separate the wheat from the chaff. I think that you've made an argument which is worth exploring. And that argument is that the arbitrator relied on a supposed zero-tolerance policy, whereas the Department of Justice policy is not a zero-tolerance policy. Correct, Your Honor. That was our first point. We said that the arbitrator… I wouldn't leave it on the floor. I would pay attention to that. Yes, Your Honor. Thank you. We argued initially that the arbitrator applied the incorrect legal standard by applying a zero-tolerance policy. If you look at the arbitrator's award, page 8 of the appendix, the arbitrator clearly states that, quote, the zero-tolerance policy must take precedence. We would argue that this is not the correct legal standard. You cannot apply a zero-tolerance policy. In the case of Douglas v. Veterans Administration… Well, I think you can apply a zero-tolerance policy. I think we… The question is, is there such a policy here? You may not have read the Baird case, but it's cited in the government's brief. The Baird case we held that an Army policy developed pursuant to the executive order on drug-free workplace was not a zero-tolerance policy, and that if the discipline were based on the notion that it were a zero-tolerance policy, it might be invalid. It seems to be somewhat the same contention that's being made here, is that the arbitrator assumed that he was dealing with a zero-tolerance policy, but in fact, on the face of it, it appears as though the policy is not a zero-tolerance policy. I would agree with that point, Your Honor. There was no evidence that there was a zero-tolerance policy that was enacted by the Bureau of Prisons, and therefore, applying such a policy would certainly be a clear error of law in that issue. Martin, what about the fact that the arbitrator found here that Mr. Torres, I think the arbitrator specifically said, and I'm looking at page, let's see, it's attached to your brief, it's A8, Grieven apparently had no knowledge that steroids were being administered, And then he goes on to talk about the zero-tolerance policy that you've been discussing with Judge Dyke. But what about the fact that we have a finding here, it's not a contention, but we have a finding by the arbitrator that Mr. Torres did not know he was taking steroids? Certainly, Your Honor. How significant do you think that is? What does it play into? Sure. I think it's significant for two points. First of all, it would go towards the Douglas factors, the mitigating factors of what exactly Mr. Torres did and what his actions were. Because, as the arbitrator stated in his award, they were inadvertent, that certainly should have been taken into consideration when we get to applying the Douglas factors. Because he was charged with illegal conduct, correct? Well, Your Honor, I would first say he wasn't charged for anything. He admitted to using steroids. He wasn't charged by the agency in the removal. And I guess what I was thinking about, the agency charged him with illegal drug use, correct? Yes, Your Honor. And the thought came to mind, in order for someone to do something illegally, do they have to know that they're doing it?  So you're saying that there's a problem because he was charged with an illegal act, but he didn't have the intent. Correct, correct. And also, we have a recent decision, again, which addresses that question, with which I hope the government's familiar with the Doe case, where we held that where someone was disciplined based on assumed illegality of the conduct, and the conduct, in fact, wasn't illegal, that there had to be a determination by the board that the discipline would have occurred anyway. And we don't have such a determination by the arbitrator here. In fact, we don't have a determination by the arbitrator as to whether the conduct was legal or illegal. Correct, correct, Your Honor. Your Honor, I would also point to, on page 62 of the joint appendix is an excerpt from the executive order 12564. This is the drug-free workplace. So what page is that, Mr. McClain? I'm sorry, page 62. And this executive order specifically states that illegal drugs means a controlled substance included in Schedule 1 and Schedule 2. Again, as we discussed earlier, steroids are clearly listed as a Schedule 3 substance that would not be defined as an illegal drug under this executive order, which is another point I think we need to look at. The agency's, I guess it's the drug-free policy, is reflected in its program statement, correct? And that's what we have. The executive order gave rise to various agency drug policies. And I guess, am I correct in thinking that at 121, starting at A121, we have the agency's drug policy? Yes, Your Honor. 121 is the beginning of the agency's drug-free workplace. But I was simply on page 61, again, referring to the executive order, which would set this in place, that did define illegal drugs and did not include Schedule 3 drugs as an illegal drug. Going back to another issue again. Where were these drugs administered? Was it administered in the United States or in England? Or don't we know from the record? This fight took place in England, which is where the testing occurred. Does the record show where the drugs were administered? Sir, if I can think back, the only thing I can think of, the evidence as to where the drugs were administered, was Mr Torres was preparing for the fight. I can't remember any testimony specifically on where the drugs were administered. No, sir. Again, going back to the point that the arbitrator's decision was unreasonable, I pointed to several cases in my brief where officers were charged with and terminated with either possession or use of an illegal drug, Schedule 1, Schedule 2 drug. These cases include Kruger v. Department of Justice, Bolling v. Department of Justice, Lewis v. Department of Justice, and George v. Department of Justice. All of these cases include instances where an officer, again, was either charged with and terminated for using drugs or possession of drugs. In all of these cases, the termination was overturned by the board, mainly for the point that the employees showed a good potential for rehabilitation. Now, the instances where the board has upheld the termination are usually with cases where the employee has not shown to have a potential for rehabilitation. Those cases include Martin v. Department of Justice, Jones v. Department of Justice, Mueller v. Department of Justice, and Berry v. Department of Justice. All of these involve officers that were terminated based on drug use or drug possession that did result in the termination that was upheld by the board, mainly, as we would argue, because these employees did not show a potential for rehabilitation. Those cases were all illegal drugs, was it not? Correct, Your Honor. If I can read through here real quickly, I believe these were all also Schedule 1 and Schedule 2 drugs, again, whereas the petitioner's actions involve a Schedule 3 substance. We would argue that the petitioner's conduct, again, was inadvertent and certainly not as severe as these cases cited before Martin, Jones, Mueller, and Berry. Also, the petitioner showed remorse and had an excellent potential for rehabilitation. Therefore, we believe that the facts in this case closely resemble those of the Martin, Jones, Mueller I'm sorry, the Kruger, Boling, Lewis, and George case as opposed to the Martin, Jones. We're into your rebuttal time. Do you want to save the rest of it? Let's hear from Ms. Cohen. Yes, Your Honor. Thank you, Ms. Cohen. Have a seat. May it please the Court, we respectfully request that this Court affirm the arbitrator's decision We have two problems here, okay? Problem one, the arbitrator relied on a zero-tolerance policy. The Justice Department policy doesn't seem to be a zero-tolerance policy. And in Baird, we said in a similar situation involving the Army that if you mistakenly rely on a zero-tolerance policy, that calls the discipline into question. Point two that you have to address, it seems to me, is the Doe case. And that is that the discipline here was founded on the notion that this was illegal conduct. The arbitrator didn't find it was illegal and there's a ground, at least, to argue that it wasn't illegal because it was a Schedule III drug and also it wasn't taken knowingly. So why don't we have to vacate and remand under Baird and Doe? Well, starting with the zero-tolerance policy issue, the arbitrator, first of all, did not specifically say that he was finding only under the zero-tolerance policy that that was the basis for his affirmance of the removal. If you look at the arbitrator's decision on page 8 of the appendix, he says the testimony about the grievance conduct and poor judgment and also consideration of the Douglas factors was persuasive in deciding this matter. Yeah, but he says the zero-tolerance policy must take precedence over these feelings. I mean, it sounds to me as though he's reading the policy as being a zero-tolerance policy and is giving great weight to that. He's giving weight to the Douglas factors, to the conduct and poor judgment. He's also giving weight to the drug policy, which he does mistakenly call a zero-tolerance policy. We would agree with the court that it's not specifically a zero-tolerance policy. But he's referring to the drug policy and the policy against the use of illegal drugs or abuse of legal drugs and saying that it has to take precedence over sympathy because the grievant had no knowledge that steroids were being administered. To me, that's a weighing of the Douglas factors. That is, it's a mitigating factor that the grievant didn't know that it was steroids initially. Excuse me for jumping in, but time is fleeting, as you know. Let me ask you this. He was charged, and I'm looking at A137, with use of an illegal substance, and that's the Schedule III steroid here. But the arbitrator said, the arbitrator found, he apparently had said he apparently had no knowledge that steroids were being administered. And I have to be honest, what troubles me, he's charged with illegal drug use, with use of an illegal drug, but the finder of fact has found he didn't know it was illegal. And how does it promote the efficiency of the service, the nexus connection, to remove someone for use of an illegal drug when they didn't know the drug was illegal? The arbitrator's finding that it was that he didn't know that the substance was the steroids would be that he wasn't, use of an illegal substance, you can't argue that it wasn't an illegal substance, clearly using steroids wasn't an illegal substance. Oh my gosh, I mean, if he didn't know, I mean, supposing anyone in this room goes to a doctor and they get a drug put into them that's illegal, they don't know it, they're not going to be charged with anything, are they? If they don't know, no, probably. And he didn't know here. The arbitrator found, as a matter of fact, that Mr. Torres did not know he was having an illegal substance injected into him. And how does it promote the efficiency of the service to remove someone for use of an illegal substance when they don't know it? Well, there are several factors here. One is the notoriety of what he did. The inmates and the staff at the correctional... No, but that doesn't relate to the... Does that relate to the basic question, though? I mean, everyone knew that there was no question that he was injected with the steroid. He admitted it and it was on the website and no question about that. But it seems to me the issue is here he didn't know it. And it's not just a case of where he's making the contention, I didn't know, but the... I'm sorry, we're used to AJs. The arbitrator found, as a matter of fact, that he did not know. How can you promote the efficiency of the service by removing someone for using an illegal substance when there's a finding, in fact, they didn't know they were using an illegal substance? Well, there are two other issues with his use of the substance. One is his judgment in accepting an injection from his trainer. But he was charged with use of an illegal drug and he didn't know that. He wasn't charged with going to see his trainer and so forth. You have to kind of stick with the charge. That's what's bothering me. I mean, it just seems awfully... I don't want to use the unfair because sometimes life isn't fair, but I just have a problem seeing how the efficiency of the service is promoted by removing someone for illegal drug use when the arbitrator finds they didn't know it was illegal. The specific charge was use of illegal drugs, but part of the basis for the charge or the reason that removal was reasonable in light of the charge was that the use of the substance showed poor judgment... But doesn't the charge use of an illegal drug? OK, that's the charge, right? Doesn't that necessarily presuppose that the person knew it was illegal? Not necessarily, no. But why would you remove someone if they didn't know what they were doing was wrong? Well, again, it goes to their judgment in deciding to do what they were doing, whether or not they knew at the time. But he didn't know he was using an illegal drug. That's correct. I mean, it's bad judgment to go out and use illegal drugs, to say the least. But if you don't know you're doing it, how is that bad judgment? Now, maybe someone could say, well, he shouldn't have gone to the trainer, he should have gone to a doctor and so forth, but that's not what he was charged with. Well, the use of the illegal... They didn't charge him with not following proper procedures. He said illegal drug. Right, they charged him with use of an illegal drug, but part of what was leading up to his use of the illegal drug was that he went to the trainer and accepted an injection of something that he was unaware of what it was. But is there anything in the record, there's nothing in the record, no finding that it's wrong to go to a trainer? I mean, I have no knowledge one way or the other. Maybe trainers are authorized to give people injections. Maybe they're not. I have no idea. And there's nothing in the record on it. But again, he's not charged with going to the trainer and having an injection. He's charged with using an illegal drug. It may be that going to the trainer was... Maybe it was legal for the trainer to give injections. Maybe it wasn't. I don't know. But that's not the charge, and there's nothing in the record on it. The charge is using the illegal drug, and the way in which he used the illegal drug was to go and obtain it from the trainer, so certainly that portion of the conduct... No, there's no question, but he got it from the trainer, but assume for the moment that a trainer is authorized under certain circumstances to give someone an injection. I don't know. Maybe the trainer is or isn't. But if you assume that... If you have an injury and the trainer says, I will give you this to treat it, and you don't know it's an illegal substance, what's... He wasn't charged with going to the trainer. Let me help you here. I helped your opposing counsel, so I'll help you, too, okay? It seems to me the argument that you should be making is that every time somebody takes an illegal drug, it's very common for people to argue that they didn't know that it was illegal or they didn't know that they were taking it. That's a very common thing. And so if you're going to have an effective policy, you can't allow supposed lack of knowledge to be a defense. That would be an argument. The problem with that argument, however, is that that's not what he was charged with. I mean, he was charged with illegal conduct. So it strikes me that the fact that he may not have acted illegally is something that's pretty significant here as a defense, as Judge Schall is suggesting. No? The charge, again, was use of an illegal drug, but the factors supporting the charge, the reason that the removal was upheld, were not specifically that the substance was illegal, but rather his judgment, first of all, in accepting the injections, and secondly, because he did not report once he did find out that it was, in fact, an illegal drug, that he failed to report. But would you agree that the Schedule C products are not illegal as compared with Schedule 1 and 2? What he was really charged with, I suppose, is bad judgment in taking steroids, that athletes aren't supposed to take steroids. Isn't that what seems to be behind all of this? The Schedule 1 and 2 drugs are defined as illegal drugs by the agency. The Schedule 3 drugs are considered controlled substances. In this case, it was a drug that was meant to be used by veterinarians. But controlled substance is quite a difference between illegality and a controlled substance, is there not? Putting aside the question of whether he knew or didn't know, assuming that he knew he was taking steroids, then that would be illegal because it's not meant to be used in humans. The way that he used it was illegal. Whether it's illegal depends on not the rules of the Department of Justice. They don't say, if you're an athlete, avoid steroids because athletes aren't supposed to do that. Right. I'm not discussing the rules of the Department of Justice. I'm talking about federal law governing the use of the steroid that he used, specifically says that it's illegal. Federal law? The notorious, that I read in the newspapers about some superstars are also going to jail because they agreed or were found to have taken steroids? Yes. So federal law, in this case, governs the use of the drug, and the use of the drug is not meant to be used in humans. So his use... But does federal law apply? I mean, isn't it pretty clear from the record these injections took place in England? No, it's not clear from the record. It's clear that the fight was in England, but the fight occurred in September. The injections occurred in June, July, May, June, July, depending on which... Where was he living in June and July? Now, that's not clear from the record, but from the surrounding circumstances, my guess would be that he was living in Hawaii and working at his correctional officer job during the summer months and simply traveled to England for this one particular fight, which took place in September of that year because he specifically took leave to travel to England to go to this fight. So it would be my assumption that during the summer months he was working at his correctional officer job in the United States. So federal law, in that case, would apply to his use of the drug. I would assume that probably the agency's policy would apply. I mean, assume for the moment that you had a federal prison that was located near the Canadian border, and assume for the moment that certain drugs that are illegal in this country were legal here, and the person went in over the Canadian border after work every day and used the drugs in Canada where it was legal, but then came back here and those drugs had a negative effect. I mean, I think probably the government would have maybe a good argument there. Certainly, the policy would apply there. Whether federal law would apply, I'm not familiar with. But what bothers me is... So, I mean, I think you have an argument on that, but what bothers... You know, it's not your fault you're stuck with the case, but I mean, what bothers me is the intent issue here. How can you... When there's a finding that the person didn't know it was an illegal substance. If you didn't have that finding, it would be a completely different case, but the arbitrator found that. And I just... I'm bothered. You know, again, it's not your fault, but I'm bothered by the fact that there's a finding of nexus for an offence when someone didn't know what they were doing, that they were having the illegal drug. It just doesn't seem... It almost sounds Kafkaesque, you know what I mean? I understand your concerns with his lack of knowledge about whether the drug was legal or not, but certainly, if not a concern about taking the drug, there certainly was a problem with his lack of reporting, timely reporting the drug. That's not what he was charged with. No, he was charged with use of the drug, but in considering removal, certainly the agency, one of the factors the agency considered was his reporting or failure to report. Right, but it had to stick with the charge. Right. And that might play into the Douglas factors and mitigation, but if he's charged with illegal drug use and he doesn't know it's illegal... Again, the only response I have for you on that is the judgment in accepting the drug, whether he knew it was legal or not. I don't know what trainers are or are not permitted to give, but certainly I think he should have been suspicious of obtaining an objection from his trainer without a prescription, without knowing what it was, particularly given his position as a law enforcement officer who are held to a higher standard than ordinary federal employees and particularly that he was in the Bureau of Prisons and in charge of taking care and custody of individuals who were also charged with drug offenses, that he should have been more careful in considering what drugs he may or may not have been taking. Okay. Thank you, Ms. Cohen. Thank you. Mr. Martin, you have a couple of minutes. I'd just like to make one quick final point. When Mr. Torres, after he admitted to... that he had tested positive for steroids, as the testimony shows, he went in and admitted to the agency what had happened, and he was allowed to continue working. He continued to work in the mailroom for a period of time. He was then moved to a SHU officer position where he had direct contact with inmates. He was later moved back to the mailroom until he was terminated May 12, 2008. And during this period of time, he received a performance evaluation, which can be found on page 185 and 186 of the appendix. This was completed by his direct supervisor, noting that his rating was exceeds. There was a handwritten note stating that he did a good job. The rater's comment on page 186 was that the petitioner has performed all assignments in the most effective manner during the year and displays a positive attitude toward all work assignments and day-to-day contact with both inmates and staff. Well, this would all really go to the penalty, correct? I mean, assuming... in other words, mitigating type of factors... this would go to the reasonableness of the penalty, wouldn't it? Sure, Your Honor. This would show that, in fact, his efficiency of service was not affected by whatever his actions were. In fact, he was able to go back to work and do, quote, a good job until he was later terminated on May 12, 2008. So as far as what evidence there is as to how this would affect his efficiency of service, there's direct evidence of how this affected his efficiency of service. It had no effect. In fact, he did a good job. Yeah, but we can't second-guess the arbitrator about that sort of stuff. You've got better arguments than that. Yes, Your Honor. That's all I have. Thank you, Mr. Martin and Ms. Cone-Havison. The case is taken in resolution.